**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

DENNIS COOK AND ROBERT : 
HABERMAN, individually and as : 
representatives of the classes, : 
                               :     C.A. NO. 1:11-cv-00268-M-DLM
          Plaintiffs, : 
                               : 
v. :     **SECOND AMENDED CLASS ACTION**
                               :               **COMPLAINT**
RBS CITIZENS, N.A., d/b/a CITIZENS :     **(JURY TRIAL DEMANDED)**
BANK, : 
                               : 
          Defendant. : 

Plaintiffs Dennis Cook and Robert Haberman ("Plaintiffs"), by and through their attorneys Nichols Kaster, PLLP and Muller Law, LLC, and on behalf of themselves, the Putative Classes set forth below, and in the public interest, bring the following Second Amended Complaint against RBS Citizens, N.A., doing business as Citizens Bank ("Citizens" or "RBS Citizens"):

## PRELIMINARY STATEMENT

1.    Plaintiffs and the Putative Class members currently have or formerly had mortgage loans or lines of credit secured by residential property, and were required to purchase flood insurance by Citizens.

2.    As alleged below, Citizens unfairly, deceptively, and unlawfully forced Plaintiffs and other Putative Class members to purchase and maintain flood insurance on their property in amounts greater than required by law, greater than required by their borrower agreements, and greater than Citizens' financial interest in their property, without justification.

3.      In addition, Citizens unfairly arranged for kickbacks, commissions, or other compensation for Citizens and/or its affiliates in connection with force-placed (also known as lender-placed) flood insurance.

4.      Further, the flood insurance policies that Citizens force-placed were worthless, where borrowers already had flood insurance in an amount sufficient to cover their principal balance or available credit line.   These force-placed flood insurance policies are secondary to other flood insurance policies, and do not provide coverage greater than the net amount that is owed on the mortgage (regardless of the face value of the policy).

5.      Citizens engaged in this conduct in bad faith, knowing that its actions were contrary to applicable law, reasonable commercial standards of fair dealing, and the reasonable expectations of Plaintiffs and other borrowers upon entering into their mortgage agreements.

6.      Based on Citizens' conduct as described herein, Plaintiffs assert claims against Citizens for (1) violation of the Truth In Lending Act ("TILA"); (2) breach of contract and breach of the covenant of good faith and fair dealing; (3) violation of the New York Deceptive Practices Act ("NYDPA"); and (4) violation of the Connecticut Unfair Trade Practices Act ("CUTPA").

7.      Plaintiffs assert these claims on behalf of one proposed class and two proposed subclasses of Citizens borrowers (the "Putative Classes").[1]

8.      Plaintiffs assert their federal TILA claim (Count 1) and common law breach of contract and breach of covenant of good faith and fair dealing claim (Count 2) on behalf of

---

[1] Plaintiffs reserve their right to amend their proposed class definitions or to propose other or additional classes in their class certification motion, after having an opportunity for discovery.

a Putative Excess Insurance Class consisting of all persons in the United States who were required by Citizens, during the applicable limitations period,[2] to purchase or maintain flood insurance for their property in an amount at least equal to the National Flood Insurance Program maximum or the replacement cost value of their property, as a condition of any residential mortgage loan or line of credit secured by such property.

9.      Plaintiff Cook asserts his NYDPA claim (Count 3) on behalf of a Putative New York Sub-Class consisting of all persons in the Excess Insurance Class whose mortgage loan or line of credit with Citizens was secured by real property in the State of New York, and who were subject to Citizens' flood insurance requirements and/or had lender-placed flood insurance coverage purchased for their property by Citizens on or after July 1, 2008.

10.      Plaintiff Haberman asserts his CUTPA claim (Count 4) on behalf of a Connecticut Sub-Class consisting of all persons in the Excess Insurance Class whose mortgage loan or line of credit with Citizens was secured by real property in the State of Connecticut, and who were subject to Citizens' flood insurance requirements and/or had lender-placed flood insurance coverage purchased for their property by Citizens on or after July 1, 2008.

11.      Plaintiffs and the Putative Classes seek injunctive relief, corresponding declaratory relief, monetary relief, and other appropriate relief for Citizens' unlawful conduct, as described herein.

---

[2] The statute of limitations on Plaintiff's TILA claim is one year.  *See* 15 U.S.C. § 1640(e). The statute of limitations on Plaintiff's contract claim is six years.

**THE PARTIES**

12.     Individual and representative Plaintiff Dennis Cook ("Cook") resides in Onondaga County in the State of New York.  Plaintiff is a member of the Excess Insurance Class and New York Sub-Class as defined below.

13.     Individual and representative Plaintiff Robert Haberman ("Haberman") resides in New London County in the State of Connecticut.  Haberman is a member of the Excess Insurance Class and Connecticut Sub-Class as defined below.

14.     Defendant RBS Citizens is a national banking association headquartered in Rhode Island.  RBS Citizens does business in several states throughout the country, including Rhode Island, New York, and Connecticut.

**JURISDICTION AND VENUE**

15.     The Court has federal question jurisdiction over Plaintiff's TILA claim pursuant to 28 U.S.C. § 1331, and has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

16.      In addition, the Court has original jurisdiction under the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d)(2).  Plaintiffs and Defendant are citizens of different states.  The amount in controversy in this action exceeds $5,000,000.00, and there are more than 100 members of each of the Putative Classes.

17.     Venue is proper in the United States District Court, District of Rhode Island, pursuant to 28 U.S.C. § 1391, because RBS Citizens is headquartered in Rhode Island, and a substantial part of the events giving rise to Plaintiffs' claims arose in Rhode Island.

## FACTUAL ALLEGATIONS

*Allegations Relating to Plaintiff Dennis Cook*

18.     On or about May 6, 2003, Cook obtained a home equity line of credit ("HELOC") from Charter One Bank, N.A. ("Charter One") with a maximum available credit limit of $39,500, which was secured by a mortgage on his residential property.  Citizens acquired Cook's HELOC in 2004, and it is the current lender-in-interest.[3]

19.     Because Cook's home falls within a Special Flood Hazard Area ("SFHA"), federal law requires flood insurance on his home as a condition of any loan or line of credit secured by his property.  For loans, this coverage must be maintained "in an amount at least equal to the outstanding principal balance of the loan or the maximum limit of coverage made available under the Act, ***whichever is less***."  42 U.S.C. § 4012a(b)(1) (emphasis added).  For lines, the required amount of coverage is equal to "the total amount of the line, the value of the improved property or the maximum amount of flood insurance coverage available, ***whichever is less.***"  *Hofstetter v. Chase Home Fin., LLC,* No. 10-1313, 2010 WL 3259773, at *7-10 (N.D. Cal. Aug. 16, 2010) ("*Hofstetter I*") (emphasis added); *accord*, *Hofstetter v. Chase Home Fin., LLC,* 751 F. Supp. 2d, 1116, 1126-27 (N.D. Cal. 2010) ("*Hofstetter II*").

20.     Upon originating his HELOC, Cook received and signed a "Notice of Special Flood Hazards and Availability of Federal Disaster Relief Assistance" ("Flood Insurance Notice").  *See Exhibit 1*.  This Flood Insurance Notice informed Cook that his residence was located in a SFHA, indicated that he was required to maintain adequate flood insurance, and

---

[3] Plaintiff also has a mortgage loan with M & T Bank ("M & T"), which is secured by the same residential property as his Citizens line of credit.  As of December 17, 2010, the principal balance on Plaintiff's M & T mortgage was approximately $17,000.

stated that "[a]t a minimum, flood insurance purchased must cover *the lesser of*: (1) the outstanding principal balance of the loan; or (2) the maximum amount of coverage allowed for the type of property under the NFIP." (emphasis added).

21.    Upon originating his HELOC, Cook also received and signed a "Credit Line Mortgage" ("Mortgage").  *See Exhibit 2*.  Paragraph 5 of the Mortgage states that Cook is obligated to "keep the Property insured against loss of fire, flood, theft and other hazards" and that he must maintain such insurance "in the amounts and for the periods that Lender requires."  It continues to explain that "if mortgagor fails to maintain the coverage described above, Lender may, at Lender's option, obtain coverage *to protect Lender's rights in the Property* according to the terms of this Security instrument." (emphasis added).[4]

22.    At the time Cook originated his HELOC, he maintained $102,500 worth of flood insurance on his property (an amount sufficient to protect his lenders' interest under both his line of credit and his mortgage loan), and he continued to maintain flood insurance coverage in an amount sufficient to protect the interest of his lenders thereafter.   No additional coverage was required by Charter One upon originating Cook's HELOC and no additional coverage was required by Citizens upon initially acquiring the HELOC.

23.    On December 19, 2010, several years *after* acquiring Cook's HELOC, Citizens sent Cook a form letter claiming that he had "a deficiency for flood coverage in the amount of $54,100[,]" and further claiming that he was required to obtain coverage in an amount at least equal to "100% of the replacement cost of the structure or the maximum limit

---

[4] Plaintiff's Mortgage does *not* state in Paragraph 5 (or anywhere else) that the lender's insurance requirements can change.  In this regard, Plaintiff's Mortgage differs from the current Fannie Mae/Freddie Mac Single Family Uniform Instrument for New York, which states as follows in the section of the document pertaining to insurance: "What Lender requires pursuant to the preceding sentences can change during the term of the Loan." *See Exhibit 3, ¶ 5*.

of coverage available for the particular type of property under the Flood Disaster Protection Act." *See Exhibit 4.*

24.     This form letter was deceptive and misleading.  Citizens' requirement is inconsistent with federal law because it does not give the borrower the option of insuring to the total amount of the line.  Further, Cook's Mortgage Documents[5] do not specify such a coverage requirement, and no such requirement was imposed when Cook originated his HELOC.  Conspicuously, Citizens' form letter did not explain why Cook's existing amount of flood insurance was suddenly deficient.

25.     This form letter stated that if Cook did not cure this alleged "deficiency" in his flood insurance coverage, Citizens would procure additional coverage for him and add the premium cost to his principal balance.  In addition, the form letter indicated that the insurance coverage purchased by Citizens likely would be more expensive than flood insurance coverage purchased by Cook from an agent or insurance company of his choice.

26.     Citizens subsequently sent Cook another form letter dated February 13, 2011, entitled "Flood Insurance Deficiency Notification" ("Deficiency Notification").  *See Exhibit 5.*  In this Deficiency Notification, Citizens informed Cook that it had purchased additional flood insurance coverage for Cook's property, and enclosed a declarations page issued by American Security Insurance Company ("ASIC") showing a coverage amount of $54,100. Citizens indicated that the cost of this one-year policy was $487, and further indicated that the "additional cost has been added to your principal balance."  This letter also restated that Cook was required to maintain flood insurance in an amount at least equal to "100% of the

---

[5] All documents received and/or signed upon origination of Cook's HELOC, including his Mortgage and Flood Insurance Notice, are collectively referred to herein as "Mortgage Documents."

replacement cost of the structure or the maximum limit of coverage available for the particular type of property under the Flood Disaster Protection Act."

27.     Citizens' Deficiency Notification was deceptive and misleading.  Under the terms of the Cook's Mortgage, Citizens may only force-place flood insurance **to protect Lender's rights in the Property**.  Citizens' rights in Cook's property extend only so far as its financial stake in the property, *i.e.*, the total amount of Cook's available credit line. Similarly, federal law only authorizes lenders to force-place coverage to the extent **required** by federal law and does not give lenders a blank check to force-place excess coverage.  *See* 42 U.S.C. §§ 4012a(e)(1)–(2) ("[If] the lender or servicer for the loan determines that the building . . . is covered by such insurance in an amount less than the amount **required** for the property . . . the lender or servicer for the loan shall purchase the insurance on behalf of the borrower") (emphasis added)).

28.     Moreover, this force-placed insurance was **worthless** because the policy that Citizens purchased did not actually provide Cook with any additional coverage.   The declarations page to the force-placed policy stated that "THIS INSURANCE WILL NOT PROVIDE AN AMOUNT OF COVERAGE GREATER THAN THE NET AMOUNT YOU OWE ON THE MORTGAGE."  *Exhibit 5 at 4.*  Moreover, the Deficiency Notification indicated that "[c]overage under this policy will only apply if a loss to your building exceeds the amount of coverage provided by your voluntary flood insurance policy."  *Id.*  At the time of Citizens' letters, Cook already was maintaining flood insurance that was more than sufficient to satisfy federal requirements and more than sufficient to cover his available credit line (as well as his first mortgage with M & T).  Thus, the force-placed policy provided no *bona fide* value to either Cook or Citizens.

29.     Citizens knew or should have known that Cook was not "required" to purchase additional flood insurance for his home, as evidenced by, *inter alia*, the following facts:

    a)  Federal law does not require flood insurance in excess of the total amount of funds extended;

    b)  Cook's Mortgage Documents do not require additional flood insurance;

    c)  Charter One did not require flood insurance in excess of the amount of funds extended upon originating Cook's HELOC;

    d)  Citizens held and serviced Cook's HELOC for more than five years, without ever claiming that Cook was "required" to obtain flood insurance for the full replacement cost value of his home; and

    e)  Citizens did not and cannot identify any changes in federal law, the Mortgage Documents, or the circumstances surrounding the extension of credit that justified Citizens' representation that Cook's coverage suddenly was not adequate and was less than the coverage required.

30.     As a result of Citizens' conduct, Cook was wrongfully charged $487 for unnecessary and unlawful forced-placed flood insurance, plus interest on this amount.[6]

31.     When Cook contacted Citizens by phone to dispute the force-placed insurance and request reversal of the charges, Citizens told Cook that the only way to avoid such charges would be to pay off the remaining balance and close his HELOC.

32.     In order to rid himself of these charges and Citizens' burdensome and unjustified flood insurance requirements, Cook subsequently closed his HELOC in February

---

[6] By February 28, 2011, the charges had accrued $0.55 in interest.

of 2011.  At that time, Citizens charged him a $51 closing fee, and only partially reimbursed

him in the amount of $413 for the flood insurance-related charges made on his line of credit.

***Allegations Relating to Plaintiff Robert Haberman***

33.     On or about October 21, 2002, Haberman obtained a HELOC from Citizens

Bank of Connecticut, with a maximum available credit limit of $50,000, which was secured

by a mortgage on his residential property.[7]

34.     On or about September 1, 2007, Citizens Bank of Connecticut merged into

RBS   Citizens.   *See*   http://www2.fdic.gov/idasp/confirmation_outside.asp?inCert1=18197   (last

visited Jan. 27, 2012).  RBS Citizens is the current lender-in-interest to Haberman's HELOC

and services the HELOC.

35.     Because Haberman's property is located in a SFHA, federal law requires flood

insurance on his home, as a condition of his HELOC, in an amount equal to "the ***total***

***amount of the line***, the value of the improved property or the maximum amount of flood

insurance coverage available, ***whichever is less.***"  *See supra* at ¶ 19 (*quoting Hofstetter I*,

2010 WL 3259773, at *7-10) (emphasis added).

36.     Consistent with this federal requirement, Haberman's HELOC Agreement

provides:

> **Insurance.**   You must maintain insurance on the Property securing this
> Agreement through any company of your choice that is reasonably
> satisfactory to us for the ***lesser of*** the replacement cost of the buildings or
> appurtenances securing the Property or ***the amount of the Credit Line*** plus
> any priority liens.

*Exhibit 6 at 4, ¶ 13.*[8]

---

[7] Haberman does not have any other loans or lines of credit secured by his property.

[8] Curiously, Haberman's Open-End Mortgage ("Mortgage") states that insurance against loss
by fire and other unspecified hazards "shall be maintained for the full replacement value of
the property."  *Exhibit 7 at 1, ¶ 4.*   However, Paragraph 24 of the Mortgage identifies the

37.     In addition, Haberman also signed the same Flood Insurance Notice as Cook, which provides: "At a minimum, flood insurance purchased must cover **the lesser of**: (1) **the outstanding principal balance** of the loan; or (2) the maximum amount of coverage allowed for the type of property under the NFIP." *Exhibit 8* (emphasis added).

38.     At all relevant times, Haberman has maintained flood insurance on his property in an amount sufficient to meet federal requirements and the requirements of his HELOC Agreement.   Upon originating his HELOC, Haberman obtained $50,000 worth of flood insurance for his property, and has continued to maintain this amount of coverage since that time.   No additional coverage was required by Citizens Bank of Connecticut upon originating Haberman's HELOC, and no additional coverage was required by Citizens Bank of Connecticut or RBS Citizens for several years afterward.

39.     However, on November 15, 2011, nine years **after** Haberman originated his HELOC (and more than four years after Citizens Bank of Connecticut merged into RBS Citizens), RBS Citizens sent Haberman a form letter claiming that:

> The minimum amount of coverage must be equal to the lesser of:
>
> - 100% of the replacement cost of the structure(s)
>   OR
> - The maximum limit of coverage available for the particular type of property under the Flood Disaster Protection Act.

*Exhibit 9.*

40.     This form letter was deceptive and misleading.   Citizens' requirement is inconsistent with federal law because it does not give the borrower the option of insuring to

---

HELOC Agreement as a rider to the Mortgage that "shall amend and supplement the covenants and agreements" of the Mortgage.  *Id. at 3, ¶ 24.*  Therefore, to the extent that the hazard insurance provision of the Mortgage has any application to flood insurance (which Haberman disputes), the insurance provisions of the HELOC Agreement are controlling.

the total amount of the line.  Further, Haberman's HELOC Agreement does not specify such a coverage requirement, and no such requirement was imposed when Haberman originated his HELOC.  Conspicuously, Citizens' form letter did not explain why flood insurance coverage in excess of Haberman's available credit line was now being required.

41.     After receiving this form letter, Haberman contacted Citizens' "Insurance Department" at the 1-800 number listed in the letter, to object to this force-placed flood insurance coverage.  In response, a call center representative named Bill stated that Citizens had changed its policy regarding how much flood insurance was required.  "Bill" (or one of his supervisors) claimed that this policy change was due to changes in FEMA flood insurance requirements.  However, this assertion was false.  FEMA's Mandatory Purchase of Flood Insurance Guidelines have remained the same since 2007.   Moreover, FEMA's Guidelines expressly state that (1) "FEMA does not have statutory responsibility for enforcing the mandate to purchase flood insurance"; and (2) the Guidelines "are not intended to provide legal guidance."  FEMA, NATIONAL FLOOD INSURANCE PROGRAM: MANDATORY PURCHASE OF FLOOD INSURANCE GUIDELINES vii.

42.     Haberman also contacted Citizens' local branch office in Mystic, Connecticut, in an effort to resolve the situation.  During this phone call, a branch representative confirmed that Citizens had adopted a new set of flood insurance requirements.

43.     Haberman's HELOC Agreement does not allow Citizens to change the terms of his HELOC Agreement, except in rare circumstances that do not apply here.  Paragraph 25 of the HELOC Agreement provides:

> **Change in Terms.**  We may make changes to the terms of this Agreement if you agree to the change in writing at that time, if the change will unequivocally benefit you throughout the remainder of your Credit Line Account, or if the change is insignificant[.]

*Exhibit 6 at 7, ¶ 25.*

44.     Incredulous at Citizens' attempt to change the terms of his HELOC Agreement, Haberman sent a fax to Citizens on December 1, 2011, objecting to its new flood insurance requirement.  In this fax, Haberman stated:

> Please find faxed my flood ins. coverage equal to the value of my equity loan $50k.  If more coverage is required by Citizens Bank, it is in violation of a contract we signed in 2002 based on the value of the loan.

*Exhibit 10*  (emphasis in original).

45.     Instead of addressing Haberman's concerns, Citizens sent Haberman a Flood Insurance Deficiency Notification on December 12, 2011, which was substantially similar to the deficiency Notification that Citizens sent to Cook in November.  *See Exhibit 11*.  In this Deficiency Notification, Citizens informed Haberman that it had purchased additional flood insurance coverage for his property, and enclosed a declarations page issued by ASIC showing a coverage amount of $200,000.[9]  Citizens indicated that the cost of this additional coverage was $1,800, and further indicated that "[t]his additional cost has been added to your principal balance."  This letter also restated that Haberman was required to maintain flood insurance in an amount at least equal to "100% of the replacement cost of the structure or the maximum limit of coverage available for the particular type of property under the Flood Disaster Protection Act."

46.     After receiving this Deficiency Notification, Haberman set up an in-person meeting at the Citizens branch office in New London, Connecticut on December 14, 2011, in a further effort to resolve the situation.  During this meeting, Haberman shared his HELOC Agreement and other documentation with two branch employees.  Based on the materials that

---

[9] This force-placed "coverage," like the coverage that was force-placed on Cook's property, was secondary to Haberman's existing coverage.

Haberman shared with them, these branch employees indicated that they thought his concerns were legitimate, and promised to get back to him.

47.     Two days later, on December 16, 2011, Haberman received a call from someone in Citizens' complaints department.  This person falsely asserted that Citizens' new flood insurance requirement is consistent with Paragraph 13 of his HELOC Agreement, even though it clearly is not.

48.     Citizens knew or should have known that Haberman was not required to purchase additional flood insurance for his home because:

      a)  Federal law does not require flood insurance in excess of the total amount of funds extended;

      b)  Haberman's HELOC Agreement does not require additional flood insurance;

      c)  Haberman's Flood Insurance Notice does not require additional flood insurance;

      d)  Citizens Bank of Connecticut did not require flood insurance in excess of the amount of funds extended upon originating Haberman's HELOC;

      e)  Citizens Bank of Connecticut and RBS Citizens collectively held and serviced Haberman's HELOC for more than nine years, without ever claiming that Cook was "required" to obtain flood insurance for the full replacement cost value of his home; and

      f)  RBS Citizens did not and cannot identify any changes in federal law, the relevant agreements, or the circumstances surrounding the extension of

credit that justified Citizens' representation that Haberman's coverage suddenly was not adequate and was less than the coverage required.

49.     On December 29, 2011, Citizens sent Haberman a monthly HELOC statement showing that it had added $1,800 to his principal balance for force-placed flood insurance. The same statement also shows that these additional amounts are accruing interest.

50.     In order to protect his credit and his home, Haberman has paid these interest charges for unauthorized flood insurance against his will, and will suffer additional interest charges unless the underlying flood insurance charge is reversed.

***Allegations Relating to Kickbacks and Commissions***

51.     On information and belief, Citizens and/or its affiliates have received kickbacks or commissions from ASIC on force-placed flood insurance policies, including the force-placed policies that were purchased for Plaintiffs.

52.     It is a matter of public record that ASIC pays commissions to lenders and/or their affiliates on lender-placed flood insurance coverage. *See, e.g., Hofstetter v. Chase Home Fin. LLC,* No. 10-1313, 2011 WL 1225900 (N.D. Cal. Mar. 31, 2011) ("*Hofstetter III*") (certifying class of borrowers to pursue claim that commissions were paid by ASIC to an affiliate of Chase on lender-placed flood insurance coverage); *Gipson v. Fleet Mortg. Group, Inc.*, 232 F. Supp.2d 691, 707 (S.D. Miss. 2002) ( "Fleet [Bank] entered into an arrangement with American Security by which it was paid fees and commissions" on force-placed insurance).

53.     Moreover, the commission arrangements between major banks and insurance companies that issue force-placed coverage (including ASIC) have been reported in *American Banker* magazine. *See Exhibit 12*.

54.     Although Citizens does not admit to this kickback or commission arrangement in its form letters, the allegations relating to unfair kickbacks or commissions will have further evidentiary support after a reasonable opportunity for further investigation and discovery.  *See* Fed. R. Civ. P. 11(b)(3).

## CLASS ACTION ALLEGATIONS

55.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

56.     Plaintiffs assert their TILA claim in Count 1 and breach of contract/breach of covenant of good faith and fair dealing claim in Count 2 on behalf of a putative nationwide Excess Insurance Class defined as follows:

> **Proposed Excess Insurance Class:**  All persons in the United States who were required by Citizens, during the applicable limitations period, to purchase or maintain flood insurance for their property in an amount at least equal to the National Flood Insurance Program maximum or the replacement cost value of their property, as a condition of any residential mortgage loan or line of credit secured by such property.

57.     Plaintiff Cook asserts his NYDPA claim in Count 3 on behalf of a Putative New York Sub-Class defined as follows:

> **Proposed New York Sub-Class:**  All persons in the Excess Insurance Class whose mortgage loan or line of credit with Citizens was secured by real property in the State of New York, and who were subject to Citizens' flood insurance requirements and/or had lender-placed flood insurance coverage purchased for their property by Citizens on or after July 1, 2008.

58.     Plaintiff Haberman asserts his CUTPA claim in Count 4 on behalf of a Putative Connecticut Sub-Class defined as follows:

> **Proposed Connecticut Sub-Class:**  All persons in the Excess Insurance Class whose mortgage loan or line of credit with Citizens was secured by real property in the State of Connecticut, and who were subject to Citizens' flood insurance requirements and/or had lender-placed flood insurance coverage purchased for their property by Citizens on or after July 1, 2008.

59.    Numerosity:   The Putative Classes are so numerous that joinder of all members is impracticable.  Plaintiffs are informed and believe that during the relevant time period, thousands of Citizens' customers satisfy the definition of the Putative Classes.

60.    Typicality:     Plaintiffs' claims are typical of the members of the Putative Classes.  Plaintiffs are informed and believe that (1) their borrower agreements are typical of those of other Putative Class members; (2) the form letters they received are typical of those received by the other Putative Class members; (3) Citizens treated them consistent with other Putative Class members in accordance with Citizens' uniform policies and practices; (4) it was typical for Citizens to require its customers to purchase and maintain flood insurance in amounts greater than that required by law, greater than that required by their borrower agreements, and greater than that required to insure the amount of funds extended to them; (5) it was typical for Citizens and/or its affiliates to receive kickbacks or commissions in connection with lender-placed flood insurance; and (6) the force-placed flood insurance purchased by Citizens typically was secondary to other flood insurance policies, and did not provide coverage greater than the net amount owed on the mortgage (regardless of the face value of the policy).

61.    Adequacy:     Plaintiffs will fairly and adequately protect the interests of the Putative Classes, and have retained counsel experienced in complex class action litigation, including flood insurance litigation.

62.    Commonality:  Common questions of law and fact exist as to all members of the Putative Classes and predominate over any questions solely affecting individual members of the Putative Classes, including but not limited to:

17

a)  whether federal law requires Citizens' customers to purchase and/or maintain flood insurance in amounts greater than necessary to secure the amount of funds extended to them;

b)  whether Citizens has a pervasive policy and practice of misrepresenting to customers that federal law requires flood insurance or additional flood insurance on loans or lines of credit for which flood insurance or additional flood insurance is not required by law;

c)  whether the borrower agreements relied upon by Citizens authorize Citizens to demand and/or force-place flood insurance in amounts greater than necessary to secure the amount of funds extended;

d)  whether Citizens' form letters are false, deceptive, and/or misleading;

e)  whether Citizens violated the TILA by misrepresenting customers' flood insurance requirements, by changing its flood insurance requirements without proper notice and consent, and/or by failing to make proper finance charge disclosures or other disclosures in connection with flood insurance;

f)  whether Citizens breached its contracts with customers by demanding unauthorized amounts of flood insurance or amounts that were not properly and adequately disclosed;

g)  whether Citizens owes its customers a duty of good faith and fair dealing, and if so, whether Citizens breached this duty by, *inter alia*, (1) demanding flood insurance in amounts greater than necessary to secure the amount of funds extended and greater than required by federal law; (2)

misrepresenting borrowers' flood insurance obligations; (3) arranging for

kickbacks or commissions for itself and/or its affiliates in connection with

force-placed flood insurance; and (4) purchasing worthless flood insurance

coverage;

h)   whether Citizens' conduct as described herein violates the NYDPA and/or

CUTPA;

i)   the appropriateness and proper form of any declaratory or injunctive relief;

and

j)   the appropriateness and proper measure of monetary and other damages

sustained by the Putative Classes.

63.     This case is maintainable as a class action under Fed. R. Civ. P. 23(b)(1)
because prosecution of actions by or against individual class members would result in
inconsistent or varying adjudications and create the risk of incompatible standards of conduct
for Citizens.  Further, adjudication of each individual class member's claim as a separate
action would potentially be dispositive of the interest of other individuals not a party to such
action, impeding their ability to protect their interests.

64.     This case is maintainable as a class action under Fed. R. Civ. P. 23(b)(2)
because Citizens has acted or refused to act on grounds that apply generally to the Putative
Classes, so that final injunctive relief or corresponding declaratory relief is appropriate
respecting the Classes as a whole.

65.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because
questions of law and fact common to the Putative Classes predominate over any questions
affecting only individual members of the Putative Classes, and because a class action is

superior to other available methods for the fair and efficient adjudication of this litigation. Citizens' conduct described in this Complaint stems from common and uniform policies and practices, resulting in unnecessary flood insurance premiums and related charges that are readily calculable from Citizens' records and other class-wide evidence.  Members of the Putative Classes do not have an interest in pursuing separate individual actions against Citizens, as the amount of each class member's individual claims is small compared to the expense and burden of individual prosecution.  Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Citizens' practices.  Moreover, management of this action as a class action will not present any likely difficulties.  In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Putative Class members' claims in a single forum.

66.     Plaintiffs intend to send notice to all members of the Putative Classes to the extent required by Rule 23.  The names and addresses of the Putative Class members are available from Citizens' records.

## FIRST CLAIM FOR RELIEF
### VIOLATION OF THE TRUTH IN LENDING ACT ("TILA")
### 15 U.S.C. § 1601, *et seq.*

67.     Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

68.     Citizens is a "creditor" as defined by the TILA, 15 U.S.C. § 1601 *et seq.*, and is subject to the requirements of the TILA and all related regulations, commentary, and interpretive guidance promulgated by the Federal Reserve Board.

69.    Citizens has violated the TILA in at least three respects, as previously explained in Plaintiff Cook's Objection to Citizens' Partial Motion to Dismiss (ECF No. 12) and his supporting Memorandum of Law (ECF No. 12-1).

70.    First, Citizens unlawfully changed the terms of Plaintiffs' HELOCs by unilaterally increasing the required amount of flood insurance coverage after origination.  *See Hofstetter II*, 751 F. Supp. 2d at 1124-28 & 1130 ("By making this move, defendants exposed themselves to . . . TILA[.]"); *Wulf v. Bank of America, N.A.*, No. 10-5176, -- F. Supp. 2d --, 2011 WL 2550628, at *12-13 (E.D. Pa. Apr. 15, 2011) ("Plaintiff's TILA claim survives the motion to dismiss. . . . Plaintiff's TILA claim is based on the change in flood insurance requirements[.]").  Under 12 C.F.R. § 226.5b(f)(3), lenders are prohibited from changing "any" term of a home equity credit plan.  This "change of terms prohibition applies to all features of a plan, not only those required to be disclosed" under the TILA.  12 C.F.R. pt. 226, Supp. I, § 5b(f)(3), cmt. 1; *see also* 15 U.S.C. § 1647(c) ("No open end consumer credit plan under which extensions of credit are secured by a consumer's principal residence may contain a provision which permits a creditor to change any term required to be disclosed under section 1637a(a) of this title *or any other term* . . . .") (emphasis added).[10]

---

[10] It is no defense that a borrower agreement may purport to give the lender discretion to determine the amount of coverage that is required.  *See* 12 C.F.R. pt. 226, Supp. I, § 5b(f)(3), cmt. 1 ("A creditor may not include a general provision in its agreement permitting changes to any or all of the terms of the plan.  For example, creditors may not include 'boilerplate' language in the agreement stating that they reserve the right to change the fees imposed under the plan."); *accord*, 15 U.S.C. § 1647(c).  Although "[a] creditor . . . may provide in the initial agreement that specified changes will occur if a specified event takes place," (12 C.F.R. § 226.5b(f)(3)(i)), Plaintiffs' borrower agreements did not identify any specific triggering events that would precipitate a change in flood insurance requirements, much less specify how the lender's flood insurance requirements would change upon the happening of such unidentified events.  Moreover, Citizens' boilerplate flood insurance notices failed to identify any change in circumstances that precipitated Citizens' arbitrary increase in its flood insurance requirements.  *See supra* at ¶¶ 24, 29(e), 40, 48(f).

71.     Second, even if such a change of terms were not *per se* unlawful, Citizens

failed to provide proper notice of any change of terms.  If Citizens wanted to increase its

flood insurance requirements, it was obligated to disclose that it was proposing a change of

terms of Plaintiffs' credit plans under 12 C.F.R. § 226.9(c)(1), and obtain Plaintiffs' written

consent to the change under 12 C.F.R. § 226.5b(f)(3)(iii).  Instead, Citizens pretended that its

onerous flood insurance demands were consistent with Plaintiffs' existing credit plans.  This

also was unlawful under TILA.  *See Hofstetter II*, 751 F. Supp.2d at 1128 ("[T]his order also

finds that a plausible claim under 12 C.F.R. 226.9(c) has been stated.  This particular claim is

premised on the allegation that [defendant] 'fail[ed] to provide proper notice, after

origination, that [it] was amending the terms of the credit plans as described in the deeds of

trust[.]'"); *Wulf*, 2011 WL 2550628, at *12 ("Plaintiffs have stated a claim that they were

entitled to new disclosure under TILA.").[11]

---

[11] Under the TILA and its accompanying regulations, lenders are required to disclose "[t]he conditions under which a finance charge may be imposed" and also identify any other charges that may be imposed as part of a home equity credit plan.  15 U.S.C. § 1637(a)(1), (5); 12 C.F.R. § 226.6(a)(1), (2); *see also* 12 C.F.R. § 226.18(d) (closed-end finance charge disclosure requirements).  The term 'finance charge' expressly includes "[p]remiums or other charges for insurance against loss of or damage to property . . . written in connection with a credit transaction."  12 C.F.R. § 226.4(b)(8).  Although insurance premiums are not considered "finance charges" if the borrower is free to select the insurance carrier (12 C.F.R. § 226.4(d)(2)), this rule does not apply where a lender demands and force-places **unauthorized** insurance.  *See Hofstetter II*, 751 F. Supp. 2d at 1128 (unauthorized "property insurance coverage written in connection with a loan triggers mandatory 'finance charge' disclosures"); *Bermudez v. First of Am. Bank Champion, N.A.*, 860 F.Supp. 580, 601 (N.D. Ill. 1994), *withdrawn pursuant to settlement*, 886 F.Supp. 643 (N.D. Ill. Mar 22, 1995) ("If a factfinder found such charges to be unauthorized, then it could also find that the charging of plaintiffs' accounts for the cost of that insurance . . . [was] a finance charge."); *Travis v. Boulevard Bank, N.A.*, 880 F.Supp. 1226, 1229-30 (N.D. Ill. 1995) ("Citizens' purchase of the allegedly unauthorized insurance and the subsequent addition of the resulting premiums to Plaintiffs' existing indebtedness constituted a new credit transaction" that "required new disclosures"); *Vician v. Wells Fargo Home Mortg.*, 2006 WL 694740, at *5 (N.D. Ind. Mar. 16, 2006) ("Wells Fargo's actions in force-placing insurance on Plaintiffs' account may have triggered new disclosures"); *Motley v. Homecomings Fin., LLC*, 557 F. Supp. 2d 1005, 1009

72.     Third, Citizens also violated the TILA by misrepresenting the terms of Plaintiffs' borrower agreements relating to flood insurance.   The most fundamental requirement of the Truth-In-Lending Act – as the name of the Act implies – is to provide borrowers with clear and accurate disclosures of loan terms.   As a result, any disclosures made by a lender to a borrower must accurately "reflect the terms of the legal obligation between the parties." 12 C.F.R. § 226.5(c)(3); *see also* 12 C.F.R. § 226.17(c) (relating to closed-ended loans).[12]   As set forth above, Citizens made misleading statements in violation of the TILA by sending flood insurance notices to Plaintiffs and other borrowers that misstated borrowers' flood insurance obligations.   These misleading statements regarding borrowers' flood insurance obligations constitute a "departure from the mortgage documentation" and violate the TILA.  *Wulf*, 2011 WL 2550628, at *12; *see also Travis*, 880 F. Supp. at 1230 (finding TILA violation as "the result of Citizens' departure from the contract").

73.     The TILA violations set forth above occurred within one year of the commencement of this action.  To the extent that the violations described above occurred earlier, Plaintiffs did not discover and did not have a reasonable opportunity to discover

---

n.3 (D. Minn. 2008).  Even where the force-placement of insurance is authorized – which it was not here – "[t]he creditor may . . . be required to provide a new disclosure(s) under section 226.9(c)." 12 C.F.R. pt. 226, Supp. I, § 5(e), cmt. 1; *see also* 12 C.F.R. pt. 226, Supp. I, § 17(e), cmt. 1 (parallel provision applying to closed-end loans).

[12] This duty to make truthful and accurate disclosures is an ongoing duty, and applies to ***both*** subsequent disclosures and initial disclosures at the time of the transaction.  *See Hubbard v. Fidelity Fed. Bank*, 91 F.3d 75, 79 & n.7 (9th Cir. 1996) (rejecting Citizens' argument that duty to make accurate disclosures "only applies to disclosures before consummation of the transaction").  Where a creditor sends out notices, after the date of the transaction, which misstate the borrower's obligations, such notices give rise to liability under the TILA.  *See Hubbard*, 91 F.3d at 79 (Citizens' "payment adjustment notices were required to reflect the loan agreement"); *Demando v. Morris*, 206 F.3d 1300, 1303 (9th Cir. 2000) ("Because the Notice contained terms that were in violation of the credit agreement, the Notice violated Regulation Z.").

Citizens' violations until less than one year before this action commenced.  Prior to this time, Plaintiffs had no reason or opportunity to complain about Citizens' TILA violations.

74.     Citizens systematically and pervasively engaged in similar violations of the TILA to the detriment of other members of the Excess Insurance Class.

75.     Plaintiffs and the Excess Insurance Class have been injured and have suffered actual damages and monetary losses as a result of Citizens' TILA violations.

76.     As a result of Citizens' violations, Plaintiffs and the Excess Insurance Class are entitled to recover actual damages and a penalty of $500,000.00 or 1% of Citizens' net worth, as provided by 15 U.S.C. § 1640(a)(1)–(2).

77.     Plaintiffs and the Excess Insurance Class also are also entitled to recovery of attorneys' fees and costs to be paid by Citizens, as provided by 15 U.S.C. § 1640(a)(3).

## SECOND CLAIM FOR RELIEF
## BREACH OF CONTRACT/ BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

78.     Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

79.     Citizens is the lender-in-interest to Plaintiffs' borrower agreements and is bound by the terms of their borrower agreements.

80.     Plaintiffs' borrower agreements do not require flood insurance coverage in an amount greater than federal requirements or the amount of funds extended to them.

81.     Citizens breached the terms of Plaintiffs' borrower agreements (and other class members' borrower agreements) by requiring them to obtain and/or maintain flood insurance in excess of the amount required, and/or by force-placing flood insurance in excess of the amount required.

82.     Citizens also breached the implied covenant of good faith and fair dealing inherent in Plaintiffs' borrower agreements.

83.     Citizens owed Plaintiffs and other class members a duty of good faith and fair dealing, by virtue of Citizens' contractual relationship with Plaintiffs and other class members.

84.     Citizens breached this duty by, among other things: (1) misrepresenting borrower' flood insurance obligations; (2) demanding and/or force-placing flood insurance coverage in excess of the amount required by federal law or the relevant borrower agreements, and in excess of the amount required to protect Citizens' legitimate financial interests; (3) unreasonably exercising in bad faith any purported discretionary authority Citizens claims it was afforded under the relevant borrower agreements; (4) imposing contractual requirements that did not exist or that exceeded the requirements disclosed in the relevant borrower agreements; (5) arranging for kickbacks, commissions, or other compensation for itself and/or its affiliates in connection with force-placed flood insurance; and (6) purchasing worthless flood insurance coverage at borrowers' expense.

85.     Citizens willfully engaged in the foregoing conduct in bad faith, for the purpose of (1) gaining unwarranted contractual and legal advantages, and (2) depriving Plaintiffs and the putative class members of their contractual and legal rights to obtain a loan, extension of credit, or credit renewal (or maintain the same) without having to purchase flood insurance coverage in excess of the funds extended to them; (3) unfairly and unconscionably maximizing revenue from Plaintiffs and other putative class members; and (4) generating commissions, kickbacks, or other compensation for Citizens and/or its affiliates

86.     The foregoing breaches were willful and not the result of mistake or inadvertence.  On information and belief, Citizens systematically and pervasively engaged in the conduct described herein.

87.     As a direct result of Citizens' breaches of contract and breaches of the covenant of good faith and fair dealing, Plaintiffs and the Excess Insurance Class have been injured, and have suffered actual damages and monetary losses, in the form of increased insurance premiums, interest payments, and/or other charges.

88.     Plaintiffs and the Excess Insurance Class are entitled to recover their damages and other appropriate relief for the foregoing contractual breaches.

**THIRD CLAIM FOR RELIEF**
**VIOLATION OF NEW YORK DECEPTIVE PRACTICES ACT ("NYDPA")**
**N.Y. Gen. Bus. Law § 349,** *et seq.*

89.     Plaintiff Cook alleges and incorporates by reference the allegations in the preceding paragraphs.

90.     The NYDPA provides that "deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in this state are hereby declared unlawful."

91.     Citizens' actions are subject to the requirements of the NYDPA.  Citizens provided a line of credit and related services to Cook and the members of the putative New York Sub-Class for personal, family, and/or household purposes.

92.     Citizens pervasively violated the NYDPA during the relevant period, and continues to violate this statute, by virtue of the unfair, deceptive, and fraudulent practices described herein.

93.     Among other things, Citizens violated the NYDPA by:

a)  unfairly demanding and force-placing excessive and unnecessary flood insurance on property owned by Cook and other New York Sub-Class members, in amounts greater than required by law, greater than Citizens' financial interest, and contrary to the amounts agreed upon in their borrower agreements;

b)  fraudulently and deceptively misrepresenting the amount of flood insurance that Cook and the other New York Sub-Class are required to maintain;

c)  materially misrepresenting to Cook and other Putative New York Sub-Class members that federal law and/or their mortgages conferred obligations on them that they did not have;

d)  unfairly and deceptively arranging for secret kickbacks, commissions, or other compensation for itself and/or its affiliates in connection with force-placed flood insurance purchased for Cook and other New York Sub-Class members;

e)  unfairly and deceptively purchasing worthless flood insurance coverage; and

f)  engaging in other unconscionable and deceptive conduct as set forth in the Complaint.

94.    Citizens engaged in such violations for the purpose of (1) unfairly and unconscionably maximizing revenue from Cook and other New York Sub-Class members; (2) generating commissions, kickbacks, or other compensation for Citizens and/or its affiliates; (3) gaining unwarranted contractual and legal advantages; (4) depriving Cook and

other New York Sub-Class members of their contractual and legal rights to obtain a loan, extension of credit, or credit renewal (or maintain the same) without having to purchase flood insurance coverage in excess of the funds extended to them; and (5) inducing and/or forcing Cook and other New York Sub-Class members to procure unnecessary and/or excessive amounts of flood insurance.[13]

95.     Citizens willfully engaged in such conduct and knew that it violated the NYDPA or showed reckless disregard for whether it violated the NYDPA.

96.     As a result of Citizens' violations of the NYDPA, Cook and the putative New York Sub-Class have been injured and have suffered actual damages and monetary losses in the form of increased insurance premiums, interest payments, and/or other charges.

97.     Cook and the Putative New York Sub-Class members are entitled to actual damages, statutory damages, treble damages, injunctive relief, attorneys' fees and costs, and any other remedies available under the NYDPA or in equity, for Citizens' violations of the NYDPA.  *See* N.Y. Gen. Bus. Law § 349(h).

## FOURTH CLAIM FOR RELIEF
## VIOLATION OF CONNECTICUT UNFAIR TRADE PRACTICES ACT ("CUTPA")
## Conn. Gen. Stat. § 42-110a, *et seq.*

98.     Plaintiff Haberman alleges and incorporates by reference the allegations in the preceding paragraphs.

99.     The CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Conn. Gen. Stat. § 42-110b(a).

---

[13] Plaintiff and the New York Sub-Class reasonably and justifiably relied on Citizens to (among other things) fully, honestly, and fairly disclose the amount of flood insurance that was required for their property under their mortgages and federal law, and to interpret and/or apply such requirements reasonably and fairly in good faith.

100.    Citizens has pervasively violated the CUTPA, and continues to violate the CUTPA, by virtue of the unfair and deceptive acts and practices described above.

101.    Among other things, Citizens has violated the CUTPA by:

a)  Unfairly demanding and force-placing excessive and unnecessary flood insurance on property owned by Haberman and other Connecticut Sub-Class members, in amounts greater than required by law, greater than Citizens' financial interest, and contrary to the amounts agreed upon in their borrower agreements;

b)  Misrepresenting the amount of flood insurance that Haberman and other Connecticut Sub-Class members are required to maintain;

c)  Unfairly arranging for kickbacks, commissions, or other compensation for itself and/or its affiliates in connection with force-placed flood insurance purchased for Haberman and other Connecticut Sub-Class members;

d)  Unfairly purchasing worthless flood insurance coverage; and

e)  Engaging in other unfair and/or deceptive conduct as set forth in the Complaint.

102.    Citizens engaged in such violations for the purpose of (1) unfairly and unconscionably maximizing revenue from Haberman and other Connecticut Sub-Class members; (2) generating commissions, kickbacks, or other compensation for Citizens and/or its affiliates; (3) gaining unwarranted contractual and legal advantages; and (4) depriving Haberman and other Connecticut Sub-Class members of their contractual and legal rights to obtain a loan, extension of credit, or credit renewal (or maintain the same) without having to purchase flood insurance coverage in excess of the funds extended to them; and (5) inducing

and/or forcing Haberman and other Connecticut Sub-Class members to procure unnecessary and/or excessive amounts of flood insurance.[14]

103.    Citizens willfully engaged in such conduct and knew that it violated the CUTPA, or showed reckless disregard for whether it violated the CUTPA.

104.    As a result of Citizens' violations of the CUTPA, Haberman and the Connecticut Sub-Class have been injured and have suffered actual damages and monetary losses in the form of increased insurance premiums, interest payments, and/or other charges.

105.    Haberman and the Connecticut Sub-Class members are entitled to actual damages, putative damages, injunctive relief, equitable relief, attorneys' fees and costs, and any other remedies available under the CUTPA or in equity, for Citizens' violations of the CUTPA. *See* Conn. Gen. Stat. § 42-110g.

## PRAYER FOR RELIEF

106.    WHEREFORE, Plaintiffs, on behalf of themselves and the Putative Classes, pray for relief as follows:

    a)    Determining that this action may proceed as a class action under Rules 23(b)(1), (2) and (3) of the Federal Rules of Civil Procedure;

    b)    Designating Plaintiffs as class representatives for the Putative Classes;

    c)    Designating Plaintiffs' counsel as counsel for the Putative Classes;

    d)    Issuing proper notice to the Putative Classes at Citizens' expense;

    e)    Declaring that Citizens' actions violate the Truth and Lending Act;

---

[14] Plaintiff and the Connecticut Sub-Class reasonably and justifiably relied on Citizens to (among other things) fully, honestly, and fairly disclose the amount of flood insurance that was required for their property under their mortgages and federal law, and to interpret and/or apply such requirements reasonably and fairly in good faith.

f)   Declaring that Citizens breached its contracts with Plaintiffs and other Putative Class members and its duty of good faith and fair dealing to Plaintiffs and other Putative Class members;

g)   Declaring that Citizens' actions violate New York General Business Law § 349, *et seq.*, and the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a *et seq.*.

h)   Determining that Citizens acted willfully in deliberate or reckless disregard of applicable law and the rights of Plaintiffs and other borrowers;

i)   Awarding appropriate equitable relief, including but not limited to an injunction requiring Citizens to reverse all unlawful, unfair, or otherwise improper charges for insurance coverage, allowing customers to close loans or credit lines without first paying premiums for flood insurance that were not necessary or required by law, prohibiting Citizens and its affiliates from earning commissions or other compensation on force-placed flood insurance policies, prohibiting Citizens from purchasing worthless flood insurance coverage, and ordering Citizens to cease and desist from engaging in further unlawful conduct in the future;

j)   Awarding actual damages, statutory damages, treble damages, punitive damages, penalties, and interest;

k)   Awarding reasonable attorneys' fees and costs; and

l)   Granting other and further relief, in law or equity, as this Court may

deem appropriate and just.

## DEMAND FOR JURY TRIAL

107.   Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure,  Plaintiffs and

the Putative Classes demand a trial by jury.


Respectfully submitted,

Dated:  March 9, 2012                    **NICHOLS KASTER, PLLP**

*/s/ Kai Richter*
Kai Richter, MN Bar No. 0296545*
80 South Eighth Street, Suite 4600
Minneapolis, MN 55402
Telephone: (612) 256-3200
Facsimile: (612) 215-6870
Email: krichter@nka.com
*admitted pro hac vice*

AND

Chip Muller (#7686)
Muller Law, LLC
155 South Main Street, Suite 101
Providence, RI 02903
Telephone: (401) 256-5171
Facsimile: (401) 256-5178
Email: chip@chipmuller.com

**ATTORNEYS   FOR   PLAINTIFFS   AND**
**THE PUTATIVE CLASSES**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 9, 2012, a copy of the forgoing *Second Amended Class Action Complaint* was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

*/s/ Kai Richter*
Kai Richter